1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                     BROWNSVILLE DIVISION

4   UNITED STATES OF AMERICA      §     CASE NO. 1:13-CR-00003-1
                                  §     BROWNSVILLE, TEXAS
5   VERSUS                        §     TUESDAY,
                                  §     APRIL 22, 2014
6   WAYNE E. BALL                 §     1:59 P.M. TO 2:49 P.M.

7
                            SENTENCING
8
              BEFORE THE HONORABLE HILDA G. TAGLE
9                 UNITED STATES DISTRICT JUDGE

10

11                        APPEARANCES:

12      FOR PLAINTIFF/DEFENDANT:    SEE NEXT PAGE

13      COURT RECORDER:             LISA GOULDIE

14      COURT CLERK:                ROSARIO SALDANA

15

16

17

18

19

20           TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
         Tel: 281-277-5325 ▼ Fax: 281-277-0946
23           www.judicialtranscribers.com

24
      Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

1                          APPEARANCES:

2


3    FOR THE GOVERNMENT:              J.P. COONEY, ESQ.
                                      CRIMINAL DIVISION
4                                     U.S. DEPARTMENT OF JUSTICE
                                      1400 NEW YORK AVENUE, NW
5                                     12TH FLOOR
                                      WASHINGTON, DC  20005
6                                     202-514--1412

7

     FOR THE DEFENDANT:              MICHAEL J. WYNNE, ESQ.
8                                     MCDERMOTT WILL & EMERY
                                      1000 LOUISIANA ST., STE. 3900
9                                     HOUSTON, TEXAS  77002
                                      713-653-1907

10

     ALSO ATTENDING:
11
                                      VERONICA SMITH
12                                    U.S. PROBATION OFFICER

13

14

15

16

17

18

19

20

21

22

23

24

25

1     BROWNSVILLE, TEXAS; TUESDAY, APRIL 22, 2014; 1:58 P.M.

2                oOo CALL TO ORDER OF THE COURT oOo

3           THE COURT:  Good afternoon.  Please be seated.

4           MR. COONEY:  Good afternoon, Your Honor.

5      (Court confers with staff.)

6           THE COURT:  At this time, the Court calls

7   Cause Number 13-CR-3-1, United States of America versus

8   Wayne E. Ball.

9           What says the Government?

10          MR. COONEY:  J.P. Cooney, on behalf of the

11  United States.  We are prepared to go forward with

12  sentencing, Your Honor.

13          THE COURT:  What says the Defendant?

14          MR. WYNNE:  Michael Wynne, for Wayne Ball.  Ready

15  to proceed, Your Honor.

16          THE COURT:  All right.  Mr. Wynne, if you'll stand

17  in front of the Court with your client?

18          Good afternoon, sir.

19          THE DEFENDANT:  Good afternoon, ma'am.

20          THE COURT:  First of all, Mr. Wynne, have you

21  reviewed the Presentence Report with your client?

22          MR. WYNNE:  Yes, Your Honor.

23          THE COURT:  And you have -- do you have objections

24  that you're urging at this time?

25          MR. WYNNE:  Yes, Your Honor, we objected, as I

1   stated, to the two-point enhancement for abuse of trust.

2          THE COURT:  All right.  For purposes of argument,

3   sir, if you'll have a seat and, Mr. Wynne, you'll -- if

4   you'll address the Court, Mr. Cooney will respond and then

5   I'll rule.

6          MR. WYNNE:  Yes, Your Honor.

7          As set forth in our Objection, as well as in the

8   Reply, we -- to the Government's Response we filed the other

9   day, the two-point enhancement for abuse of trust, although

10  it was agreed by the Defendant and prior Counsel, it's our

11  position it does not apply in this case as set forth in the

12  first note under the Guidelines.  That is to be used when an

13  individual has a position of managerial discretion and most

14  importantly they're subject to less supervision than

15  employees whose responsibilities are primarily non-

16  discretionary in nature.

17         In the *Lamb* case from the Seventh Circuit and the

18  other cases cited, they were construing most often 2B1.1,

19  which has a base offense level of 6.  In this instance,

20  2J1.2, which has been applied in this matter, has a base

21  offense level in 14.

22         So it's our position that in most instances, that

23  would apply, for instance, to the sentencing of Mr. Pedraza,

24  who was in a position of control and discretion in that

25  particular office.  If it applied in every instance, there

1  would be no real point to add it here.

2        Now, in some instances, perhaps that might be

3  appropriate and maybe we went a little far in saying that's

4  double-counting in every instance, but in this instance it

5  certainly is.

6        Mr. Ball was still "under probation."  That means

7  when George W. Bush created the Department of Homeland

8  Security and it was dealing with a potentially unionization

9  of the workforce, they created these probationary positions

10 where Mr. Ball, at the time of the events at issue here,

11 could have been dismissed for no reason at all by

12 Mr. Pedraza.

13       He was in a position where he really didn't have

14 any discretion to say, "Yes," or "No."  He'd given up his

15 TCLEOSE commission.  He couldn't go back to the Harlingen PD

16 easily.  He was making approximately $105,000, which is a

17 substantial sum in the McAllen area.  He'd been a law

18 enforcement officer his entire career.  That had been his

19 dream.  He was trying to support his teenage daughter and he

20 was in a circumstance including, among them, we have to take

21 into account his alcohol dependency at the time, not to

22 stand up and contest his boss, Mr. Pedraza, who could have

23 dismissed him for no reason.  There was no appellate right

24 to review any dismissal in the civilian service system at

25 the time.  He was still under probation.

1          Now later on, a government attorney simply or kind

2    of in quasi-probation -- that was the first Mr. Ball had

3    ever heard of anything like that.  Mr. Ball was in the same

4    position as Mr. Vargas and the other people, the other three

5    -- two or three individuals, who received these non-

6    prosecution agreements.  I don't think they're actually

7    written.  I think they were verbal agreements.  But they're

8    all really in the same boat.

9          Mr. Ball did not have -- was not in a position of

10   substantial discretion here.  He was handed three reports,

11   which Your Honor saw.  He said he didn't even read them, he

12   didn't know what they were about, just get it done,

13   essentially to keep his job and let Mr. Pedraza do what he

14   wanted to do and allow Mr. Ball to proceed and get over his

15   probation.

16         Now, your postal employee example or your bank

17   teller example, you know, that's a little different because

18   those individuals, the postal system, simply can't review

19   every item of mail that comes through.  The bank officer

20   can't review every single deposit or transaction.  It's

21   physically impossible.  And so maybe in those instances, in

22   the *Lamb* case where the postal carrier stole 1500 pieces of

23   mail, sure, he's exercising his own individual discretion in

24   each instance.

25         In this case, Mr. Ball is given three pieces of

1  paper he didn't write, he didn't know what they said, and

2  told to sign his name.  That's -- the position -- he -- I

3  guess it's conceivable that Pedraza could have had anybody

4  initial off on those, could have got somebody from the

5  street or could have had somebody else in the office.

6          But this particular adjustment, especially when

7  the base offense level is 14, it's just not appropriate to

8  apply.  And in this instance, ironically, what happened is:

9  They frightened Mr. Ball without getting any discovery,

10  without his lawyer offering any discovery, without

11  challenging 1505, which doesn't even apply.

12          My client has pled guilty to an offense that he

13  legally could not have committed, conspiracy to violate

14  1505.  They moved him from a 14 to a 16, so with acceptance

15  off, he's at a 13 where he's reliant on the Government's

16  good graces to get him down anywhere near he'd be eligible

17  for a probationary sentence.

18          Now, he's at a 14, and take off two for acceptance

19  -- that's assuming that the Court doesn't apply the two-

20  point adjustment -- he's at a 12.  He's actually one point

21  lower than he would have been if he'd had gone through with

22  the Government's plan and be forced to testify, against his

23  good conscience, against Mr. Pedraza.

24          So it appears as if they deliberately added

25  this -- I'm certain it's because Garcia did not understand

1    it -- to put him in a position where he had to buy onto a

2    deal that he didn't understand.

3            He accepts responsibility for the facts as stated,

4    but he's not a lawyer and Mr. Garcia and Mr. Connors are not

5    experienced in this area of the law.  So we accept

6    responsibility, but certainly don't think that this

7    adjustment should apply.

8            THE COURT:  In response?

9            MR. COONEY:  Your Honor, just briefly.

10           And am I okay here or should I step forward?

11           THE COURT:  Yeah, Mr. Wynne, if you'll have a seat

12   with your client.

13           MR. WYNNE:  Sure.

14           MR. COONEY:  Just briefly, Your Honor.  I think

15   just two points merit response is, first, nowhere in the

16   Guidelines is the application of the adjustment conditioned

17   on the base offense level.  There seems to be an argument

18   that because the base offense level is 14 as opposed to 6,

19   the two-point adjustment for abuse of public trust should

20   not apply.  I don't see anywhere in the Guidelines an

21   application note that qualifies the application of an

22   adjustment on the base offense level.

23           Second, there is -- there was an argument in the

24   papers filed yesterday and that was alluded to today and I

25   think that the Defense may have said that they over-argued

1   it, but I feel the need to address it, which is the issue

2   about whether the two-point abuse of trust is kind of baked

3   into the Guideline level.

4           And the analogy I would make is that for bribery,

5   2C1.1, abuse of trust by a public official -- or excuse

6   me -- bribery by a public official or of a public official,

7   there is a two-point kicker within that Guideline itself

8   when the Defendant is a public official and, therefore, the

9   abuse of trust adjustment does not apply to that because it

10  would be a double-count.

11          But 1519 is not a statute that applies only to

12  public officials or only to law enforcement agents.  1519,

13  1505 are obstruction statutes and so it is perfectly

14  appropriate to apply an abuse of trust adjustment when, in

15  circumstances such as these, the individual is a public

16  official, a law enforcement issue who utilizes that official

17  position to commit a criminal offense.

18          Importantly, the Defendant has cited no legal

19  authority to support his position.  I'm prepared to rest on

20  my papers for the remaining legal argument and the case

21  authority we cited, but of course, I'm prepared to answer

22  any questions that Your Honor has about it.

23          THE COURT:  All right.

24          MR. WYNNE:  May I respond briefly, Your Honor?

25          THE COURT:  Yes, go ahead.

1          MR. WYNNE:  2C1.1 involves cases of extortion

2   under color of official right.  That's Section 1951, the

3   Hobbs Act, where you can have private and public extortion

4   crimes.  In fact, I've charged both of them when I was an

5   AUSA.  And on a services fraud, which until the *Skilling*

6   decision -- and this was written before the *Skilling*

7   decision was applicable in the private context.  So you

8   would distinguish Mr. Skilling from a public official 12

9   to 14.

10          1505 and 1519, on the other hand, are offenses

11  that are, in general, committed only by public officials,

12  law enforcement officers -- other persons in a position to

13  impact a file.  This has no application.  This is tailored

14  for a very different situation.

15          THE COURT:  Okay.  I'm going to overrule the

16  objection and this is my reasoning:

17          First, as to the argument that the Defendant had

18  no managerial discretion and that his responsibilities were

19  not discretionary in nature, I disagree with that because

20  the very nature of an investigator -- and in specific, this

21  -- an agency that polices law enforcement officers -- has a

22  lot of discretion in how they execute their

23  responsibilities.  They can even do surveillance.  They're

24  not under strict one, two, three, this is what you're going

25  to do today, which is what maybe a clerk in the OIG's Office

1  might be considered to have stricter checklists over the

2  things that they're supposed to do.

3        Here, you know, he can decide to do surveillance,

4  he can decide to check a database, he can interview

5  witnesses.  That's a lot of discretion in his

6  investigations.  And that's what this is all about.  It was:

7  What was done in connection with a complaint or referral in

8  connection with agents about whom there was some question as

9  to whether their conduct was unethical, illegal or contrary

10 to agency policy and so it was in the -- his decision to

11 sign off on a document that he says that he did not read,

12 but that he knew, based on prior conversations, were going

13 to be constituting a fraud or, you know, fraudulent

14 representations to some extent, if not entirely fraudulent.

15       He -- when he undertook to sign off on those

16 documents, he was not -- he was doing something that he

17 himself was doing in connection with the -- a decision that

18 would impact the investigation of the officer in that

19 Complaint Number One, which I believe that's how it was

20 identified, a "Complaint Number One" or "Investigation

21 Number One."  And he had that position, that being again the

22 Office of Inspector General being one that has even a higher

23 standard of public trust than the -- just by virtue of what

24 they do, that is, investigating claims of unethical, illegal

25 or conduct contrary to the Rules and Regulations of the

1  Department of Homeland Security.  They are entrusted with

2  that responsibility.

3          And it's for that reason that, to me, it is clear

4  that he did abuse his public trust by signing those

5  documents in an attempt to make it appear to the inspectors

6  or the auditors who were coming in to review the files to

7  make it appear as if work had been done as is shown by --

8  well, there was an offer, by the way, by agreement to

9  Defendant's Exhibit 1, which the Court admitted at a prior

10 discussion, and the Minutes of the Court should reflect

11 that --

12          MR. WYNNE:  Thank you, Your Honor.

13          THE COURT:  -- Government's Exhibit 1 -- I mean,

14 Defendant's Exhibit 1.

15          MR. WYNNE:  Yes.  Thank you, Your Honor.

16          THE COURT:  In any event -- let me see if I can

17 find that.

18          MR. WYNNE:  Do you need any copy, Your Honor?

19          THE COURT:  No, let me get -- I think I have it

20 here.  I just -- here it is, Defendant's Exhibit 1, that

21 being the Memorandum of Activity that was -- this exhibit

22 consisting of -- this Defendant's Exhibit 1 consisting of 11

23 pages that look like they've been Bates stamped and, as

24 such, the document that I'm referring to that he signed off

25 on being Bates stamped US026693, US026694, and I believe the

1    third one is unsigned -- or the 026696 does not have a

2    signature.  But in any event, it was with the intention of

3    having these documents that I've just referred to in

4    Defendant's Exhibit 1 be part of the investigation in the

5    cause number referred to in those documents.

6         So again, the Court overrules the Defendant's

7    objection to the proposed finding in Paragraph 34 of the

8    Presentence Report in -- wherein the Probation Officer

9    recommends to the Court that pursuant to Advisory Sentencing

10   Guideline 3B1.3, the offense level is increased by two

11   levels because the Defendant abused a position of trust,

12   which significantly facilitated the commission or the

13   concealment of the offense.

14       (Pause in the proceedings.)

15            THE COURT:  All right.  That objection having been

16   overruled, is there any other objection by the Defendant?

17            MR. WYNNE:  Well, at this point, that objection

18   having been overruled, I gather that the Defendant would be

19   eligible for the third acceptance poin? .

20            THE COURT:  Is the Government making such a

21   motion?

22            MR. COONEY:  The Government does not oppose the

23   Defendant being awarded the third acceptance point as stated

24   in the Plea Agreement and for the reasons I set forth in the

25   Legal Memorandum we filed last Tuesday.

1          THE COURT:  All right.  The request is granted.

2          Anything else?

3          MR. WYNNE:  Yes, Your Honor.  The Defendant has

4   also requested a downward departure for a couple of reasons,

5   including aberrant behavior from the various submissions

6   that we've made.  Mr. Ball was an Eagle Scout, received

7   numerous accommodations for all of his work as a law

8   enforcement officer.  We have submitted letters that I'm

9   sure the Court has read from his prior colleagues and

10  supervisors.  And this one instance where he did not stand

11  up to Mr. Pedraza stands in stark contrast to his entire

12  exemplary career as a law enforcement officer.

13          He has already suffered a huge stigma.  He's been

14  taken out of a position that he's dreamt about all his life.

15  There's a lot of negative publicity about him, and he's now

16  working on an oil rig and making the best of the situation

17  he has now to provide for himself and his family.

18          He has also been to his Alcoholics Anonymous

19  meetings on a very consistent basis.  I'm not sure he's

20  missed one.  Complied completely with Pretrial Services and

21  has soberly really turned his life around and this is an

22  opportunity for him to -- this is an opportunity for him to

23  continue to give and to contribute to this community.  No

24  just purpose would be served by incarcerating this man at

25  this time, when our prisons are already overcrowded and

1    we're considering lowering or making exceptions to the

2    statutory minimums in several instances.  This is a

3    contributing man.  He contributes to his family, contributes

4    to society.

5            Along the same lines, I'm concerned about what

6    appears to be somewhat selective prosecution and the other

7    individuals who were not prosecuted, just Mr. Ball singled

8    out for some reason or the other, perhaps, you know, because

9    he had just a little bit more seniority.  Maybe they needed

10   somebody to be part of this alleged conspiracy with

11   Mr. Pedraza, but he is left as kind of the odd man out.

12           Now, he -- because he made the choice partly on

13   recommendation and discussion with me not to participate and

14   testify because of how upset and how angry he was January

15   and February of this year about how he'd been treated by the

16   Government and decided that he didn't trust them to follow

17   through with the 5K even if he did testify, was concerned

18   they wouldn't be happy anyway with his testimony, he felt he

19   couldn't do it, he couldn't stand up and face his family and

20   his child having done something like that.  And the

21   important thing is what this man is like at the end of the

22   day whenever he served and satisfied whatever punishment the

23   Court justly imposes on him.

24           And, therefore, pursuant to the case I cited, the

25   recent case from the Fifth Circuit, we'd ask the Court to

1  consider the substantial assistance that Mr. Ball provided

2  in those lengthy interviews.  It must have been of

3  significant value for them to keep coming back to him

4  repeated times interviewing him at length, providing

5  truthful information.  He spilled his guts that first

6  meeting in February.

7           Some decision was made not to bring him before the

8  Grand Jury -- not because Mr. Ball didn't want to go, he was

9  there.  In fact, they first told him that he didn't even

10  need to bring a lawyer up.  But he went anyway and he was

11  prepared to go, he was prepared to testify.  I guess

12  beforehand they told him, "You don't need to be here before

13  the Grand Jury, but come up anyway.  You don't need a

14  lawyer, but come."  And he brought Mr. Connors, who again is

15  not experienced in these kinds of cases.

16           But they continued to come back to him.  He

17  continued to cooperate, do everything they wanted until the

18  original lawyer he struck the deal with disappeared without

19  even saying, "Goodbye."  I've dealt with cooperating

20  Defendants before and if you're going to switch, you at

21  least have the respect to meet the guy and say, "This other

22  prosecutor is going to take over."

23           He felt he had been tricked when he went to

24  Washington and he was very -- he was a very, very angry man

25  when I first met him.  That's not a witness the Government

1  wanted, but he still provided substantial assistance.  He

2  resigned immediately saving the Government money and

3  provided all the information he possibly could and was

4  extremely contrite.  He should get substantial credit for

5  that.

6          And we'd ask for a combination of those in

7  addition to perhaps taking into account the psychiatric

8  examination we submitted from Friday or Saturday in

9  considering 3H1.3, his mental and emotional condition.  At

10  the time, he admittedly was drinking an average of 13 to

11  20 beers a day, obviously impairing his judgment.  But there

12  are a number of reasons he's turned his life around why some

13  combination of those departures can't be granted in order to

14  get this man to a position of some type of probationary

15  sentence or home confinement along with a probationary

16  sentence, that would allow him to continue his good work on

17  the rig where he's rising to supervisory ranks and

18  contributing to this economy and this society.  Justice will

19  not be served by sending this man to jail where, as I have

20  observed, people who come out often end up much worse than

21  they were when they got in.

22          I've gotten to know Mr. Ball extremely well the

23  past couple of months and he's gone from someone who was

24  very angry and bitter to someone who's contrite and accepts

25  what he did and he wants more than anything -- he has a law

1   enforcement family.  His dad was in law enforcement his

2   entire career.  Everybody in the Valley in law enforcement

3   knows him.

4            If you want somebody to be a custodian or

5   supervise him or provide guidance every day, you've got

6   perfect examples sitting in the back of this courtroom.  His

7   brother's in law enforcement as well.  His other brother's a

8   practicing criminal defense attorney in McAllen.  They'll

9   keep an eye on him and keep on the straight and narrow.  I'm

10  concerned if he's sentenced to any term of incarceration,

11  we've lost him for good and that's unfortunate really for

12  all of us.

13           THE COURT:  Okay.  And also, in -- when I met with

14  you in Chambers, I did ask for an agreed chronology, so I'm

15  going to review that with you now that being -- well, first

16  of all, this being something that I got from the Presentence

17  Report:

18           That Mr. Ball began working with the Department

19  of Homeland Security, Office of Inspector General on

20  January 20th, 2009;

21           That the false documents were created sometime

22  around or like what they say in the Indictments, on or

23  before September the 2nd, 2011;

24           That the Office of Inspector General became aware

25  of the false documentation by him and others on

1   September 11th -- I'm sorry, not September 11th -- September

2   of 2011;

3          That his proffer agreement was executed with the

4   advice of Counsel on February 9th, 2012;

5          That the District of Columbia Grand Jury convened

6   and heard testimony from witnesses that were listed by the

7   Government.  I didn't make a complete -- I guess I did, I

8   made a list.  There was at least three names: Vargas,

9   Castillo and Gomez testified before the Grand Jury in the

10  District of Columbia in February of 2012;

11         That the individuals including those three and

12  others received non-prosecution agreements or reached an --

13  or the Government agreed to not prosecute them as a result

14  of any testimony that they would have given before the

15  District of Columbia Grand Jury and that agreement was made

16  in the summer of 2012;

17         That the target letter received by Mr. Ball was

18  dated November the 8th, 2012;

19         That he resigned on November 9th, 2012;

20         That he entered a plea of guilty on January 17th,

21  2013.

22         Is that right?

23      (No audible response.)

24         THE COURT:  Yes.

25         And that the trial of the supervising agent,

1   Pedraza, was held on the dates of March the 10th through

2   the 14th of 2014.

3           And he was found guilty on that last date, I guess

4   March 14th, 2014; is that correct?

5           MR. WYNNE:  The -- I cannot make a representation

6   on the date that the other three may have appeared before

7   the Grand Jury or the date of any non-prosecution agreement,

8   as I'm not privy to that information.

9           THE COURT:  Well, I mean, Mr. Cooney mentioned

10  that and unless -- he is an Officer of the Court.  I'm going

11  to accept his representation that that's when those events

12  occurred.

13          MR. COONEY:  That is correct, Your Honor.

14          If I could just make one tweak to the Grand Jury?

15  I believe I said that it was either February or March of

16  2012.

17          THE COURT:  Okay.

18          MR. COONEY:  The time frame all being right there,

19  I believe actually that the three that you mentioned did

20  testify in February, but it's possible it was in the first

21  half of March 2012.

22          THE COURT:  Okay.

23          MR. WYNNE:  Otherwise, that schedule is correct.

24          And one more thing for the Record and for purposes

25  of possible appeal, I would like to assert the Government's

1  declination to file any type of 5K constitutes prosecutorial

2  vindictiveness based on Mr. Ball's decision not to testify

3  at trial for purpose of the Record.

4          THE COURT:  Well, you're making that

5  representation --

6          MR. WYNNE:  Yes.

7          THE COURT:  -- or that's your characterization.

8          MR. WYNNE:  For the purposes of appeal, that I'm

9  noting that right now.

10          THE COURT:  All right.  Then let me see.

11          All right.  Mr. Wynne, are you going to call your

12  client to testify in connection with your request for a

13  departure or a variance?

14          MR. WYNNE:  Let me consult with him just a moment,

15  Your Honor.

16          THE COURT:  Mr. Cooney, you'll have an opportunity

17  to respond.

18      (Pause/Counsel confers with the Defendant.)

19          MR. WYNNE:  Your Honor, my client would like to

20  allocute, as is traditional in these instances, and I think

21  that allocution will incorporate anything he would say

22  during testimony.

23          THE COURT:  All right.  Then, Mr. Cooney, you may

24  respond to his Motion for a variance or a departure.

25          MR. COONEY:  Thank you, Your Honor.

1    First, with respect to the request for a departure

2  based on aberrant behavior, the facts in this case are

3  simply contrary to that request.  As outlined in the Legal

4  Memorandum that we filed last week, the Defendant's conduct

5  in this case was willful and deliberate and was taken upon

6  contemplation.

7    Importantly, as set forth in the *James* hearing

8  transcript that we provided as an attachment to the -- to

9  that Legal Memorandum and consistent with the testimony that

10 was presented at trial, Agent Ball was approached by two

11 other Special Agents, Vargas and Healy.  This was after

12 Pedraza had made the instruction to falsify the Reports.

13 And they went to him to do two things:

14    One, plead with him to go back and approach

15 Pedraza to try and talk him out of it because it was a bad

16 decision to falsify the Reports;

17    And two, simply to seek guidance and also convey

18 to him the risk that they were taking by doing this.

19    And his response to that was not to do either of

20 those two things, but upon listening to their concerns and

21 actively discussing with them the risks involved that they

22 could be caught because the checks that they were intending

23 to falsify in the Reports could objectively be checked at a

24 later date.  He responded simply by saying an expletive and

25 "Just do it."

1        This wasn't aberrant or off the cuff.  This was

2   something that was actually contemplated, albeit in a short

3   period of time, but also contemplated in the context of a

4   15-year career in law enforcement, not aberrant, but a

5   willful and deliberate decision understanding the

6   consequences of falsifying a criminal investigative report.

7        Moreover, as the case law I set forth in the

8   Memorandum states:  One factor that the Court should

9   consider are efforts made to mitigate that decision in

10  determining whether it was aberrant behavior or not.  And

11  this is where quite simply, the Government's response to the

12  allegations regarding both the aberrant behavior departure

13  and the substantial assistance one related to prosecutorial

14  vindictiveness or selective prosecution -- I think this is

15  where they come in to play -- these allegations are false

16  and belied by every fact in this case.

17        And I think it's very important to set forth the

18  timeline that Mr. Ball came in and met with prosecutors and

19  the decision that was made to prosecute him as opposed to

20  extend him a non-pros agreement.

21        And what these things show, as I'll set forth here

22  in just a moment, is that he didn't take serious steps to

23  mitigate at an early posture in this case, but rather he

24  took steps to limit the damage and, for a period of time

25  until it no longer suited him, cooperate with the

1  Government.

2          But importantly, the Defendant, in February of

3  2012, like virtually every other Special Agent who worked in

4  the McAllen Field Office, was served with a Grand Jury

5  subpoena.  When served with that Grand Jury subpoena, he

6  exercised the right that everyone has, but he obtained

7  Counsel.  His Counsel reached out to the Government.  His

8  Counsel instructed the Government to not speak with him

9  concerning the substance of this case and, instead,

10 negotiated a proffer agreement whereby Mr. Ball, with a

11 limited immunity, was permitted to meet with prosecutors and

12 he ultimately did not go into the Grand Jury.

13          He claims now that he always wanted to go into the

14 Grand Jury.  He seems to claim that he just somehow ended up

15 in this proffer with the Government.  In fact, it was

16 precisely what his attorney negotiated for him recognizing

17 that he was within the subject of the Grand Jury's

18 investigation, that he had criminal liability and a decision

19 was made to not place him in the Grand Jury both because he

20 had asked for the Proffer Agreement and second, Your Honor,

21 quite frankly, the statements that he made during the first

22 Proffer Agreement were not fully credited and clearly did

23 not portray the complete truth as to what occurred and the

24 Government was aware of this for a very important reason

25 that distinguishes this Defendant from the ones who received

1    non-prosecution agreements.  And that distinction is that

2    other Special Agents came forward not just when confronted

3    by the FBI or the Department of Justice, but came forward to

4    their own agency, reported what occurred, which ultimately

5    led to the report to the FBI and the criminal investigation.

6           And other agents, upon being served with a Grand

7    Jury Subpoena, went, testified before the Grand Jury and

8    frankly confessed to crimes before the Grand Jury.  And a

9    decision was made to non-pros or provide a non-prosecution

10   agreement to several of those -- or to three of those

11   Special Agents.

12          But distinguishing Mr. Ball was that he did not

13   come forward to his own agency to confess.  He told a

14   partial story when first confronted.  And unlike those other

15   agents, he never willfully just kind of went before the

16   Grand Jury and told a complete truth.  And further

17   distinguishing him from those agents is the 15-year career

18   in law enforcement that I mentioned, which far outlasted law

19   enforcement careers of Edwin Castillo, Rolando Gomez and

20   Robert Vargas.

21          And importantly, as set forth in the *James* hearing

22   transcript that we attached to our Legal Memorandum and as

23   was set forth during the trial of former Special Agent-in-

24   Charge Pedraza, Wayne Ball actually recruited Robert Vargas,

25   his co-conspirator in this, to the Department of Homeland

1   Security, Office of the Inspector General.  Wayne Ball was

2   in a position of mentorship and in a position to exercise

3   control through his influence of Robert Vargas and through

4   his experience with that agency and in law enforcement

5   generally.

6           Those factors all distinguish him from the other

7   Defendants and his claims of vindictiveness, of being

8   misled, of being told things that weren't true by our

9   prosecutors or by the FBI are simply false.

10          And one thing that I urge the Court to take into

11  consideration at sentencing today that I think frankly

12  places in context how severe the abuse of trust by a law

13  enforcement officer who writes false reports -- how

14  substantial that is and how substantial it was in this case

15  is that the source of those allegations is someone who

16  himself lied in a criminal investigative report, and that's

17  exactly the point.  Agents who involve themselves in that

18  kind of conduct lack credibility and no longer can be

19  sponsored as law enforcement witnesses.

20          Now, with respect -- I think that those issues

21  both underpin our arguments concerning aberrant behavior and

22  substantial assistance.  But now more specifically, with

23  respect to substantial assistance and cooperation, it is

24  absolutely correct that we are not moving for a 5K.  The

25  Court does have authority to consider cooperation as a 3553

1    factor and, in fact, the case law is clear that the Court

2    should consider it, doesn't have to give it as a mitigating

3    factor or a non-mitigating factor, but the Court should

4    consider it as one of the many factors under 3553.

5           But it's the Government's urging here that his

6    claim of cooperation or his claim of substantial assistance

7    should not in any way earn him some sort of lenience or a

8    mitigating sentence under the Guidelines.  We're not asking

9    that he be punished for his decision to ultimately not

10   cooperate, but he should not be awarded any additional

11   acceptance of responsibility or any additional lenience that

12   he's already receiving on the basis of his claims.

13          The Defense has argued that he wouldn't have been

14   a good witness.  He, in good conscience, made a decision

15   that he couldn't cooperate anymore.  He couldn't trust

16   prosecutors because they didn't even give him a phone call

17   to let him know that the team had changed and things of that

18   nature.  All of this scurries away from the fact of the

19   matter.

20          First, it is not -- when an individual signs up

21   for a cooperation agreement, it is not their decision about

22   whether they'll be a good witness or about whether it's in

23   the Government's strategic best interest for them to

24   testify.  That's up to the Government.

25          The Defendant -- it's not just that he refused to

1  testify, it may very well have been the case that the

2  Government would never have called him at trial and, in

3  fact, we managed to convict former Special Agent-in-Charge

4  Pedraza without his testimony, without his cooperation.

5       But his Agreement requires him to meet with the

6  Government and in those pending -- in those weeks leading up

7  to the trial, he refused to do even that.  And his claim now

8  that prosecutors never even reached out to say, "Hey, the

9  team has changed," that, too, is a false claim.  When we had

10 the discussion about chronology earlier, as Mr. Wynne

11 pointed out, he was in touch with Mr. Kidd, my colleague,

12 before the New Year in 2013.

13      I first joined this case, Your Honor, in about

14 middle of November of 2013 when Mr. Gibson, the last

15 attorney who had met with Mr. Ball, came off of the case due

16 to a scheduling conflict and we met with Mr. Wynne for the

17 first time in January 2014.

18      It's beside the point whether we ever made a phone

19 call to him to let him know who was going to be trying the

20 case, but it's further illustrative of him now pointing the

21 finger at the Government for his decisions as opposed to

22 accepting the consequences of his own.  The truth is that we

23 prosecuted Pedraza without his testimony and the assistance

24 that he provided up to that point amounted to perhaps a

25 paragraph in the Indictment, which I believe we ultimately

1  had to strike when we were before Judge Hanen for trial.

2  That's the only way in which it affected it.

3          And so under those circumstances, had he met with

4  us, had he made himself available to testify, the Government

5  would have moved for a 5K.  How substantial of one it would

6  have been, I really can't say and I think with cooperators,

7  there's always a degree of serendipity.

8          But a person cannot now come before the Court,

9  claim substantial assistance and actually seek lenience from

10  the Court when, in the weeks and months leading up to the

11  trial, they refused to even make themselves available to

12  meet.  He is no longer a cooperator.  He just received the

13  benefit of the bargain that he received in the Plea

14  Agreement, which is the 12- to 18-month sentence.

15          MR. WYNNE:  Your Honor, may I respond very

16  briefly?

17          THE COURT:  Yes.

18          MR. WYNNE:  Two pronouns Mr. Cooney used are

19  disturbing, especially with my just having left being a

20  federal prosecutor.  He said with a smile, "We" managed to

21  convict.  No, the Jury convicts.  "We" struck language in

22  the Indictment.  No, the Judge does that in the absence of

23  the Grand Jury.

24          That happens when you too overly-personalize a

25  case as a prosecutor, you're too wedded to your version of

1   the facts.  That's not the job of the Prosecutor.

2           Another element that Mr. Cooney omitted was my

3   asking for some discovery including perhaps my client's own

4   reports of interviews or the MOAs throughout that period

5   when we were struggling with a decision of whether to

6   provide Mr. Ball as a potential witness at this trial.  They

7   declined even to give my guy -- to give me, as a new

8   attorney, 302s of his own testimony.  I never did that.

9           Why would you do that?  What could you possibly

10  have to hide?  And we needed those in order to make that

11  decision and they said, "No, you can't even get those."

12          Now, that tends to fuel some element of mistrust

13  or distrust.  We've read through this 302 from Valentine's

14  Day, February 14th, 2012.  It appears to be a good account

15  of what happened.  I'm not sure what's missing that would

16  preclude an appearance before the Grand Jury, but whatever

17  it was, wasn't so bad that it would have hindered them

18  completely from coming back to Mr. Ball for more information

19  three times and for potentially offering him as a witness in

20  the Pedraza trial.

21          So, I mean, that would have been pretty strong

22  impeachment material for Mr. Eastepp, a very, very good

23  public corruption lawyer, to use against Mr. Ball if there

24  was something so bad in that first 302.

25          Second, in terms of *Giglio* and his usefulness to

1  the Department going forward because of this unfortunate

2  incident, if this had been handled administratively, yes, it

3  would have to be disclosed in the event Mr. Ball were called

4  to testify in some future case in which he was assisting a

5  prosecutor, but that's not an insurmountable hurdle.  I

6  would have been inclined to use Mr. Ball as a witness, as a

7  AUSA, providing this information as did *Giglio* to the

8  Defense beforehand because I think it could be explained

9  away, especially if further down we get in his career.  It

10 does mark him entirely off.

11          And furthermore, Mr. Ball never testified before

12 this incident and there's a lot of work to be done.  They

13 can't really have it both ways.  He was moving up to

14 supervisor rank.  Supervisors don't testify, only line

15 agents testify.  So you can't have him both moving up in a

16 supervisory rank and also say that he's criminally damaged

17 himself and rendered himself unuseful to his own agency

18 because of this *Giglio* material that would have to be handed

19 over.

20          And what's troubling here is, you know, all the

21 cases that Judge Hanen pointed out were really awful

22 examples of sort of police cover-ups of really

23 unconscionable activity, all your 1505 and 1519 cases.

24          I'll let Mr. Ball speak for himself.  He

25 vigorously denies using profanity and he'll say that in any

1   discussion with Mr. Vargas later on and these are

2   essentially uncorroborated statements by probationary

3   officers who still have to please both the Government and

4   their agency with the hope of getting their jobs back, so I

5   think they perhaps should get the credit that they're due.

6           Something has to distinguish Mr. Pedraza's

7   sentence, whatever it may be, from Mr. Ball's.  We tried to

8   do that with the two points, but they were very, very, very

9   unique circumstances.

10          THE COURT:  Well, to be honest with you, I threw

11  you all -- especially something that I thought would inure

12  to the benefit of your client that idea, but you all

13  rejected it and were ready to proceed with sentencing today.

14  Because I just felt like it was important -- as important as

15  I felt it was for me to know the circumstances of non-

16  prosecution agreements with other agents who might have

17  committed the same or similar acts, it was important for the

18  big picture to ensure that there was not a disparity in

19  sentences that the Pedraza sentencing be conducted first.

20  But I gave you all that option, I mean, without coming on

21  and drawing you a picture, but you all were ready to

22  proceed, so that's why we're here today.

23          MR. WYNNE:  We'd be glad to recess for the -- for

24  purposes of coming back, but my -- they had already made

25  travel plans.  My client starts on the rig tomorrow.  That

1    would be a big disruptive.  And that wasn't evident from --

2    to us from the Order, but we'd be glad to recess.  This is

3    an extraordinarily important matter for my client.  Your

4    Honor has already heard really about all there is to say on

5    the case.

6              And I guess we'd move to recess it for that

7    consideration.

8              THE COURT:  Well --

9              MR. WYNNE:  And I knew Counsel had made their

10   plans to travel already and I didn't want to be disruptive

11   again -- we've already had one restart -- coming from

12   Washington.

13             THE COURT:  Yes?

14             MR. COONEY:  May I be heard?

15             Your Honor, the Government opposes that and here's

16   why: I completely understand why the Court would perhaps

17   want that data point and at the end of the day, the

18   Government is not going to oppose obviously, or vehemently

19   oppose the Court using its discretion to do that.

20             But the reason why I think it's unnecessary here

21   is that we have a Defendant who stands before the Court with

22   a clear guideline range, who has been -- who has obtained

23   the acceptance of responsibility that he bargained for in

24   the Plea Agreement that the Government doesn't even object

25   to under circumstances where I think we could, and that

1    alone is going to separate him from Mr. Pedraza in his

2    sentencing guideline calculation and assure that there's not

3    a sentencing disparity.

4           I recognize that the Guidelines themselves are

5    voluntary, but any variances that Mr. Pedraza would receive

6    from the Guidelines are going to be for reasons that have

7    little to do with the conduct and perhaps more to do with

8    him in his individual circumstance that would not lead to

9    any sentencing disparity between him and Mr. Ball.

10          THE COURT:  Well, I don't have want to have any

11   doubts in my mind about that at a -- you know, at a point

12   when it's too late.

13          MR. WYNNE:  There's no reason to rush, Your Honor.

14   We'd be glad to wait.

15          THE COURT:  I'm going to do it, I'm going to

16   recess because I just want to have the big picture since the

17   way I saw it, the person who had most to benefit has yet to

18   be sentenced and you know, if -- I mean, of course, it's a

19   double-edged sword.  If the other Defendant, who had more to

20   benefit, gets a harsh sentence, then you know, my feeling

21   may be, well, what's sauce for the goose is sauce for the

22   gander.

23          But on the other hand, if -- I mean, if the

24   offense conduct is not what's going to distinguish them, but

25   the other material -- well, I mean, I'll be glad to take

1   everything else into -- I mean, everything into account.

2            But I just feel like this person, who signed off

3   on those MOAs, had a lot to lose and has lost and will

4   continue to lose, and so has the public lost the trust in

5   the agents that investigate other agents.  But I just want

6   to know that his sentence is going to be something

7   commensurate with a sentence imposed by the person who was

8   at the top of the heap or at this particular point anyway at

9   the local level.

10            I don't know what, if anything, is going to happen

11  anywhere else, but in this office is what I want for -- to

12  be satisfied as to what has occurred because you know, I

13  think that -- clearly, I don't feel that the Court has much

14  reason to believe that the public needs to be protected from

15  the Defendant from his committing other crimes in the

16  future, but the sentence that I impose has to reflect the

17  seriousness of his offense and it has to be something that

18  serves as a deterrence for others who are in a position of

19  trust especially.

20            But I guess what it comes down to is considering

21  the seriousness of the crime that this man committed, I need

22  to be satisfied that the person who was -- not -- I'm not

23  going to say "more to blame," but had more to gain from the

24  activity that he -- I mean, it all happened because of this

25  person, according to what -- a review of the evidence that

1  I've been able to go over --

2         MR. COONEY:  And, Your Honor, if -- I apologize if

3  I interrupted you, but we don't -- there's no argument from

4  the Government regarding who is more culpable here.  It's

5  the former Special Agent-in-Charge Eugene Pedraza so --

6  which I know doesn't affect whether we go forward today, but

7  I just -- I know as you were outlining that, I just wanted

8  to make clear that I'm not trying to make an argument

9  contrary to that.  He is the --

10        THE COURT:  No, no, I'm not saying that.

11        MR. COONEY:  -- more culpable party.

12        THE COURT:  But like I said, you know, whether

13  it's a signature on three documents or two documents versus,

14  you know, the -- whatever he -- actions might have been,

15  what it might have led to other people doing the same thing

16  that this man has been found guilty of.  Bottom of -- the

17  bottom line for me is:  I just would not want to have --

18  there to be a disparity in a sentence that should reflect

19  the seriousness of the crime that this man committed versus

20  the one that I feel that this other person should be held to

21  a higher standard of as well, being as their supervisor.

22        So having said all that, I'm just going to recess

23  and we'll -- when the other sentencing is completed, then

24  we'll set this down for a completion of the sentencing.

25        MR. COONEY:  May I make one recommendation with

1  respect to that, Your Honor?  That is if it would be

2  possible, to either after that sentencing is complete or

3  whenever Your Honor feels appropriate, for us to simply

4  establish a deadline for the filing of papers and whatnot --

5          THE COURT:  Yes.

6          MR. COONEY:  -- so that when we come, we can have

7  a sentencing hearing and be done.

8          THE COURT:  And, Mr. Wynne, no exclamation points

9  ever again.

10          MR. WYNNE:  Yes, Your Honor.

11          THE COURT:  No name-calling or personal attacks

12  because I will strike anything that smacks of anything other

13  than an argument based on the law.

14          MR. WYNNE:  Yes, Your Honor.

15          THE COURT:  All right.  Thank you.

16          We're in recess.

17          THE BAILIFF:  All rise.

18      (Proceedings adjourned at 2:49 p.m.)

19

20

21

22

23

24

25                    *  *  *  *  *

1           I certify that the foregoing is a correct

2    transcript to the best of my ability from the electronic

3    sound recording of the proceedings in the above-entitled

4    matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT INVOICE #52434

10   DATE:  MAY 21, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25